MONTGOMERY WARD & CO. *v.* UNITED STATES

No. 7984.—

Entry Nos. 1780; 386; 227.

First Division, Appellate Term

(Decided April 19, 1951)

*Wallace & Schwartz (Barnes, Richardson & Colburn* by *Joseph Schwartz* of counsel) for the appellant.

*David N. Edelstein*, Assistant Attorney General (*Samuel D. Spector*, special attorney), for the appellee.

Before OLIVER, COLE, and MOLLISON, Judges

MOLLISON, Judge: These are applications for review filed by plaintiff below to review the decision of Cline, J., in Reap. Dec. 7637 reported in *Montgomery Ward & Co.* v. *United States*, 21 Cust. Ct. 347. The trial judge sustained the appraised values. The applications for review involve three appeals for reappraisement covering three importations of Mexican silverware and jewelry imported at Chicago and Denver. The goods were manufactured and exported by Spratling y Artesanos, S. A., Taxco, Mexico. Two invoices representing the Chicago importations were dated July 20 and November 15, 1943, and were entered July 31 and November 22, 1943, respectively, at Chicago, and the third invoice, dated January 15, 1946, was entered February 4, 1946, at Denver. The merchandise involved in the Chicago importations was exported from Mexico on July 21, 1943, and November 17, 1943, and the Denver importation on January 17, 1946.

The silverware imported at the port of Chicago was entered at the invoice unit prices, which represented the list prices thereof, less 25 per cent discount, plus Mexican stamp tax, packed, and was appraised

at invoice unit (or list) prices, plus tax, packed. The silverware imported at the port of Denver was entered at the invoice unit price, which represented the list price, less 25 per cent discount, plus Mexican stamp tax, plus packing, and was appraised at the list price, plus tax, plus packing. There is no dispute as to the items of tax or packing. The silverware was appraised on the basis of foreign value,[1] as stated by the attorney for the defendant and as found by the trial judge, and there is no contest in respect to the proper statutory basis to be applied, the record showing that both parties agree that the foreign value and the export value were the same. The importer claims that the correct dutiable values are the list prices less 25 per centum.

There is no real dispute about most of the facts of this case. Spratling y Artesanos, S. A., manufactured many different articles of silverware and jewelry of distinctive styling, design, and quality. The firm freely offered and sold merchandise such as and similar to that involved in this case to wholesale buyers, dealers, department stores, and mail-order houses at a wholesale price which was the list or retail price less 25 per cent discount, which latter price, i. e., at 25 per cent discount, was allowed only to *bona fide* dealers, department stores, mail-order houses, and those who bought the merchandise for resale. Spratling y Artesanos, S. A., also sold at retail to tourists or consumers, who purchased the merchandise for their own personal use or consumption at the list prices. The firm conducted a retail business at a retail store in the town of Taxco, but the factory was located 2 or 3 miles outside the town of Taxco, and the wholesale business was conducted at the factory.

The proof of the plaintiff and the defendant establishes that the Spratling firm freely offered and sold to all purchasers for home consumption in Mexico at the retail or list prices without any restrictions as to resale or use. It was likewise proved by the evidence of both parties that the merchandise was freely offered and sold for home consumption and for exportation to the United States to all purchasers who bought for resale, i. e., dealers, at the wholesale price of 25 per cent discount from the retail or list prices. Spratling products were not offered for sale directly to consumers in the United States (defendant's exhibit 4, p. 6). Prices, discounts, and conditions of sale were the same for home consumption as for exportation to the United States (defendant's exhibit 4, p. 6).

---

[1] Foreign value is defined in section 402 (c) of the Tariff Act of 1930, as amended by the Customs Administrative Act of 1938, as follows:

(c) FOREIGN VALUE.—The foreign value of imported merchandise shall be the market value or the price at the time of exportation of such merchandise to the United States, at which such or similar merchandise is freely offered for sale for home consumption to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, including the cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States.

The retail quantities in which the silverware was sold by Spratling at the retail store were established by plaintiff's testimony as 1, 2, 3, or 4 pieces of the silverware or jewelry, and the defendant's customs agent's report (exhibit 5, p. 3) establishes the retail quantities in which the merchandise was sold as 1 or 2 pieces, so that there is no real dispute as to the approximate quantities in which the silverware was sold at retail to consumers for their personal use. The pieces of silverware and jewelry sold at retail were individually wrapped in little chamois or felt bags with the Spratling insigne thereon, whereas the merchandise sold at wholesale was wrapped in tissue paper and packaged in boxes in the usual way for shipment.

There was no minimum quantity of pieces of the silverware and jewelry which those who bought for resale were required to purchase in order to receive the discount; it was only required that a dealer or one buying for resale establish that he or it was a *bona fide* dealer who bought for resale only. Plaintiff proved by witness Rendon, secretary to Spratling and assistant manager, that dealers, mail-order houses, department stores, and those who bought for resale purchased in the wholesale quantities of 100 to 1,000 pieces of the silverware and jewelry. It was established through the same witness that the average number of pieces of silverware and jewelry sold to such dealers and firms in the United States was 1,000 pieces (Tr. 32) and that the average number of pieces sold to dealers in Mexico was somewhat less but not less than the minimum of 100 pieces. On cross-examination, Rendon testified (Tr. 32) that dealers in Mexico did not buy in quantities of 2, 3, 4, or 5. Rendon was asked on cross-examination whether a consumer or tourist who purchased 1,000 pieces would receive the 25 per cent discount and he replied that such discount would not be granted because he was not a *bona fide* or established dealer (Tr. 29, 30). However, on redirect it was shown that no such sales of 1,000 pieces were ever sold to tourists or consumers (Tr. 33, 34), and defendant's own proof shows the retail quantities to be 1 or 2 pieces (exhibit 5, p. 3). The defendant offered no testimonial evidence to contradict the testimony of Rendon that the silverware and jewelry were freely offered and sold to all purchasers in the usual wholesale quantities of 100 to 1,000 pieces, and there is nothing in the defendant's documentary proof which rebuts or contradicts plaintiff's proof in this respect. On the contrary, the list of wholesale buyers, dealers, department stores, and mail-order houses in the United States, shown in defendant's exhibit 4, pages 7 and 8, and the invoice sales (pp. 8, 9, 10 of same exhibit) during April to November 1944 to such buyers for resale, running into thousands of dollars in Mexican currency, corroborate the testimony of Rendon that the average of wholesale quantities sold to wholesale buyers in

the United States was 1,000 pieces. Corroboration of Rendon's testimony as to the usual wholesale quantities in respect to sales in Mexico is found in defendant's exhibit 2, page 4, last paragraph, which contains the following:

The four wholesale customers are located in Mexico City (exclusive agent), Monterrey, Matamoros, and Merida. Sales to these customers were too voluminous to be copied in detail, covering from 10 to 100 different articles, and from one to 24 of each, ordered at one time. Examination of these sales showed strict adherence to list prices and allowance of the 25% discount in each case.

A recapitulation of the situation, therefore, shows it to be as follows: Insofar as *offers* for sale were concerned, the merchandise was offered for sale to consumers at list prices and to dealers at 25 per cent discount from list prices, and the price in either case did not vary with the quantity to be purchased. Insofar as *actual sales* of the merchandise were concerned, the quantity ordinarily and usually sold at wholesale was 100 to 1,000 pieces, while the quantity ordinarily and usually sold at retail was 1 to 4 pieces.

*In theory only*, it was possible for a dealer to purchase a quantity as small as 1 piece, and for a consumer to purchase a quantity as large as 1,000 pieces—but in actual truth and fact this did not happen, for dealers normally purchased in quantities of from 100 to 1,000 pieces, while consumers normally purchased in quantities of from 1 to 4 pieces. It is manifestly absurd, therefore, to consider that merely because *in theory* a quantity of from 1 to 4 purchased by a dealer (which never happened) would equal the actual usual retail quantity of 1 to 4, the price at which the retail quantity was freely offered for sale and sold at retail could have any bearing upon the value of the merchandise under the conditions of the statute, section 402 (c), as amended.

We do not believe that the Congress, when it enacted section 402 (c) of the Tariff Act of 1930 originally, and when it amended the same, intended that the usual and ordinary retail prices, such as those existing under the facts of this case, should be used as a means for establishing and determining the value of imported merchandise. The statute uses the words "in the usual wholesale quantities" and certainly this language must mean the usual quantities of merchandise sold *at wholesale* as opposed to those sold at retail.

The words "wholesale" and "retail" are opposed to one another; they not alone refer to quantities, but also to a manner of doing business. Thus, Webster's New International Dictionary defines "wholesale" as an adjective as—

Of, pertaining to, or engaged in, wholesale trade or business; *selling or sold to retailers or jobbers rather than consumers.* [Italics added.]

Everyone recognizes the fact of business life that goods normally are sold at wholesale at lower prices than they are sold at retail, even when the same quantities are involved, and when the tariff act speaks

of "wholesale quantities" it does not necessarily only mean larger or major quantities, but also means quantities sold at a certain level of trade and commerce, i. e., sold to those who in turn resell to the consumer, or sold above the level of retailer-consumer.

It must be remembered that in the case of some types of merchandise there are consumers at the wholesale level—for example, hotels purchasing supplies for use—so that it is fair to say in some cases that offers to consumers are properly to be considered in determining value under the provisions of the statute. However, this does not mean that where merchandise is offered to ultimate consumers at the retail level such offers are to be considered in determining the value of the goods, even when such offers contemplate quantities in which such or similar merchandise is usually purchased at wholesale.

We are not unmindful of the decisions cited by the court below, particularly *United States* v. *Richard & Co.*, 15 Ct. Cust. Appls. 143, T. D. 42216, during the course of which our appellate court took occasion to say:

\* \* \* Section 402 (b) [note—the foreign value provision in the Tariff Act of 1922 which was substantially reenacted in the Tariff Act of 1930] does not provide that the wholesale price shall be the price *to wholesalers*, but the price in the usual *wholesale quantities*. The law is not concerned with the persons who buy, but the manner in which they buy. [Italics quoted.]

We do not believe that it was ever the intent of the framers of the valuation statute that, in cases where merchandise is freely offered for sale in the country of exportation both at wholesale and at retail, the price at which merchandise such as or similar to that involved is so offered for sale at retail should be given any consideration in determining its value for customs purposes under the provisions of section 402. Nor do we consider that, despite the seemingly sweeping character of language such as that quoted above from the *Richard* case, *supra*, the decisions construing the valuation provisions are uniformly to the effect that *the requirement* of the statute is that the retail prices *must* be considered in such cases.

Perhaps the only case decided by our appellate court since its statement in the *Richard* case, *supra*, in which the facts in some aspects are somewhat similar to those in the case at bar,[2] is *American Shipping Co.* (*General Electric X-Ray Corp.*) v. *United States*, 29 C. C. P. A. (Customs) 250, C. A. D. 198, cited in the opinion of the trial court, and discussed in the briefs filed herein by counsel for the parties. That case involved X-ray grids used by doctors and hospitals, and the usual quantity sold (and, presumably, offered for sale) in the home market was one, whether to consumers such as doctors and hospitals or to dealers who bought for resale. However, the price to dealers

---

[2] So far as we have been able to determine, no case embodying the precise situation here involved has ever been presented to or dealt with by our appellate court.

was substantially lower than the price charged the doctors and hospitals. Our appellate court there held that the sales to consumers, being made in wholesale quantities, i. e., one, and being within the other requirements of the statute, were to be considered in determining the value of the imported merchandise.

That case may be distinguished on its facts in that there, retail and wholesale quantities were in actual fact the same, i. e., one, while here, although *in theory* they *could* be the same, *in actual fact* they were different.

In the opinion in the case at bar the court below stated that the evidence offered by the plaintiff to the effect that the usual quantity bought by dealers was from 100 to 1,000 pieces was insufficient to establish the usual wholesale quantities in which such merchandise was bought and sold. This evidence is uncontroverted and is not inconsistent with any other evidence adduced at the trial, and we believe it is sufficient to establish the quantities in which such merchandise was usually sold at wholesale. That such evidence also establishes "the usual wholesale quantities" contemplated by the statute becomes clear when consideration is given to the word "usual" as well as the word "wholesale" in the statutory phrase "in the usual wholesale quantities."

We have already indicated our view that the word "wholesale" connotes a manner of doing business, i. e., above the retail level. Certainly, if the word "usual" in the statutory phrase means anything, it betokens that which is customary, which, in turn, implies experience, or actual fact. From the standpoint of offers for sale, the offers made by Spratling y Artesanos, S. A., were not related to quantity or quantities, since the prices both at retail and at wholesale were the same for any quantity or quantities.

If this were all that appeared in the record and there was no evidence as to actual sales under the offers, it might be said that any quantity or all quantities were "usual" quantities within the meaning of the statute, and the inquiry would be as to the application of the word "wholesale." We think that in such a situation all evidence with regard to purely retail transactions would have to be disregarded. But it is not necessary to base our conclusion upon this reasoning with respect to the offers for sale, for the evidence clearly shows that from the standpoint of actual sales, the quantities which were both "usual" and "wholesale" were 100 to 1,000 pieces, and it further shows that the price at which such quantities were actually sold was list price less 25 per cent discount.

Upon consideration of the entire record we find as facts:

1. That the merchandise involved consists of certain silverware and silver jewelry exported from Mexico on July 21 and November 17, 1943, and entered at the port of Chicago, and certain silver jewelry

exported from Mexico on January 17, 1946, and entered at the port of Denver.

2. That the price at the time of exportation of the merchandise in question in each case at which such or similar merchandise was freely offered for sale for home consumption to all purchasers in the principal markets of Mexico, in the usual wholesale quantities and in the ordinary course of trade, including the cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States, was the entered value in each case.

3. That the price at the time of exportation of the merchandise in question in each case at which such or similar merchandise was freely offered for sale for exportation to the United States was no higher.

Upon the basis of these facts we hold as matter of law:

1. That the proper basis for the determination of the value of the merchandise involved is foreign value as that value is defined in section 402 (c) of the Tariff Act of 1930, as amended by the Customs Administrative Act of June 25, 1938 (19 U. S. C. § 1402 (c), as amended).

2. That such value is the entered value in each case.

Judgment will therefore issue reversing the judgment of the trial court accordingly.